Good morning, Your Honors. May it please the Court, my name is Mary Baker, and I'm here on behalf of the plaintiff, Kevin So. With me at counsel table is local counsel Jeff Neary. The issue in this case is whether our client, Kevin So, presented evidence to satisfy Rule 56 that he had no reason to suspect that his $30 million had been taken before March or April 2006 and therefore couldn't have been on inquiry notices to fraud as to anybody to include the Kondas defendants. It's important to note that the lower court's decision here was driven by two factors, a single telephone contact between HSBC Bank and our client in November 2005, and at the invitation of defense counsel, a privilege log and adverse inferences drawn therefrom. The cases are uniformly clear. Whether a plaintiff has notice of facts that might constitute a fraud is a question for the jury. That's Gray and Briskin. That's also their case, Padola, cited in their papers. The triggering date for accrual is when a potential fraud victim learns that there is a fraudulent concealment or a misrepresentation. That's EFAB, Brandon G., Snow v. A.H. Robbins. In this case, there was no reason for Kevin So to suspect that anybody had made a fraudulent statement regarding his $30 million principle until he learns that a $30 million principle was in fact taken. His testimony on this score has been consistent in the United Kingdom, consistent in this case, and his March 2010 deposition consistent in his declaration. Moreover, it is corroborated by a third party declaration from his business partner, Byron Wang, who owned $12 million of the $30 million and had reason to know. It's also corroborated by the irrevocable bank instruction by which he understood in April 2005 that there, under no circumstances, could his $30 million be depleted. Moreover, there's nothing in the record to suggest that Kevin So had any reason to suspect that the condis defendants, who were the finders, they brought him to the hearing. At the most, he could have suspected from that HSBC call is that there's a problem between HSBC and Michael Brown. There's nothing in the record that would indicate there's any culpability, any problem with the condis defendants. It wasn't he told at that time that if he cooperated with the bank, he would get his $30 million back, which if you – that's his deposition testimony. And if, given that statement, it would be reasonable to infer he didn't have his $30 million if he had to cooperate to get it back. That was his U.K. testimony, and that's at the record at 762. And one reasonable inference from that that the trial court did not give our client is that if you cooperate with us, we'll help you get your $30 million investment back. Is that because there's this dispute between Michael Brown and HSBC that his money is going to be frozen until their investigation or litigation is complete? Again, there's nothing in the record at that time to indicate that the condis defendants were in collusion with Michael Brown. Michael Brown could – let's say that he was on – let's say he was on notice, just for sake of argument here, that Michael Brown had absconded with his profits or even for the sake of argument, the $30 million. He has no reason to know that anybody other than Michael Brown is participating in that fraud, which you have here are totally different wrongdoings. In fact, there was no way that he could even suspect the condis defendants were in collusion with Boris Lopatin and getting paid $730,000 until he sees Union Bank records in 2008, even if he had called HSBC. And he did do a reasonable investigation. He called his fiduciary and said, what's going on? She confirms for him, you know, this is just a dispute between HSBC and Michael Brown, your $30 million is safe. And that is commensurate with his understanding with the irrevocable bank instruction. But even if he had called HSBC and HSBC produced all the bank records, it's not going to uncover the $730,000 paid under the table as a kickback to the condis defendants. So, again, what you have here is a classic case of separate accrual. This is the AH Robbins and EFAB teaches that you can have completely different wrongdoings with a single defendant as AH Robbins. In that case, the plaintiff sued for personal injury from an unwanted pregnancy due to a faulty Dalkon shield. And then she also sued for fraud because AH Robbins misrepresented the number of pregnancies that occurred owing to the Dalkon shield. And what the appellate court there said was, well, okay, you should have known at the time your unwanted pregnancy occurred, your personal injury action accrued. But what they said here with respect to the fraudulent omission by AH Robbins, it's painfully obvious to us that the plaintiff could not bring an action for fraudulent concealment of information until she learned of any fraudulent concealment. The condis defendants concealed the kickbacks under the table. They concealed the true nature of their relationship with low-patent and land-based and conflicts of interest that implicated our client. Is it your position that the privilege log, Mr. So's privilege log, has no evidentiary value whatsoever? Yes, Your Honor. Why is that? And the reason for that. It has some value. I mean, it tells us something. It tells somebody, you read it, you know that on 10-26-2005, there was correspondence regarding HSBC litigation. I think the cases that we cite speak to this proposition. There's no evidentiary value whatsoever to the law. Because what you have there, the law. But those aren't, there were no, there's no Federal Circuit court case that says that, is there? There were several. I think there were district courts. District court case. The Ninth Circuit has never said that. No, I don't believe they've spoken to the issue. But let me try and answer your question first. The reason there's no evidentiary value is because what it says is the lawyers, all that says is the lawyers believe that this document contains privileged information. The privilege log is a, it's a tool to help the court sort out discovery disputes when people, when you get a document request, somebody responds and you say, oh, but these are covered by privilege. Really important to remember here, the privilege log wasn't part of the record. It's not attached to an affidavit. The underlying documents, they never filed a motion to compel. There was no in-camera review. Well, let me ask you this. Was the privilege log, how did the district court even know about the privilege log? They attached it to their reply brief on summary judgment. So we never even had a chance to respond to it there. But this, this, but this was a document that you prepared. You didn't contest that the document wasn't true and accurate. It reflected, I mean, it, it, it depicted what, what position you were taking with respect to these documents. And even if those documents hadn't been, hadn't been received by Kevin Soe, they would still appear on the privilege log. Lawyers don't call up their clients when they're going through and producing a privilege log to aid in discovery to say, okay, I've got all these documents. Did you, in fact, get this? Did you get this? Did you get this? They're preparing a privilege log because they believe in good faith that the, that the document contains privileged information. And the only person that you would have to put the lawyer on the stand and say, why did you put this document on there? And again, here, you would have to sit there and ask the client. You have to put the privilege document or the asserted privilege document and ask them about it. That never happened in this case. They weren't properly part of the record. And even if they were, I would, I would assert that you couldn't use a privilege log as, as, as an evidentiary tool. So this, this appeal is from the grant of summary judgment to certain moving defendants. And I'm not saying that the statute of limitation has run as to them. That's correct. Okay. So is the rest of the case ongoing? No. We've stayed at pending this appeal. We asked that it be stayed pending this appeal. Okay. It was reversible error for the trial court to, the trial court never says we're going to declare this to be a sham affidavit. But Van Asdale says you have to have plainly contradictory statements. That's out. And then it's reversible error where you have corroborating evidence. And here the corroborating evidence was the declaration of Bayrou Wang and the irrevocable bank instruction. So, so what did the district court do? The district court didn't declare the affidavit to be a sham affidavit. So how was the affidavit considered by the district court in your view? What, what was the effect of the affidavit? He didn't, he didn't consider it. It was clear by effect that he was declaring it a sham, but he never says, he never says that. I believe that he said it was too conclusory or something along those lines. But it's clear he disregarded it in its entirety. Even in Van Asdale, when the lower court got reversed for finding an affidavit to be a sham without doing the factual findings, the lower court kept in those parts that weren't contradictory. And the lower court didn't do that here. Let me ask you this. Even if you exclude his declaration, do you still think that there's sufficient evidence to warrant summary judgment? Even without his? I mean, even without his, even without his affidavit. So standing on the record, yes. So let's just say that the district court was correct. I mean, you know, we couldn't say he erred, but I'm just hypothetically speaking. Did you, is there enough in the record that you presented in opposition to summary judgment on this statute of limitations issue to demonstrate that there's a genuine tribal issue effect over when he learned? Plaintiff, even without the Kevin Soe affidavit, Plaintiff met its burden through the Byron Wang declaration. She is a third party. She is in a position to know. She's his business partner. She said they didn't know the principal was gone and had no reason to suspect any wrongdoing by the condis defendants by effect until March or April 2006. So you've got an uncontested declaration from Byron Wang. You also have the irrevocable bank instruction by which says the money can't be depleted below the level of 30 million. So you have those two strong pieces that would be enough to get this to a jury. Collateral estoppel. The appellees spend an inordinate amount of time in this in their brief, and it's really just a big smoke screen. The issue of whether or not Kevin Soe was on inquiry notice was never litigated in the United Kingdom. Judge Walker, who was the lower court, Justice Walker was the lower court judge there, made it clear that his judgment was confined to issues of liability between HSBC and the investors. That's at the record at 781. All of these issues, and if you go, if you look, with respect to the privilege log, if you look at the reply brief on summary judgment, the earlier summary judgment proceedings, the appellees say it was more likely than not, based on the documents in the privilege log, that Kevin Soe would have known. They're saying that's an evidentiary standard of something that you argue to a jury. All of these issues deal with fact and reasonableness and clearly require a jury to sort them out. The cases I would commend for the Court's attention, e-FAB, separate accrual. You had the embezzlement accrued one day, and then the fraudulent fact that they didn't conduct a background investigation occurred a different day. So do you allege that Lucy Liu was part of this conspiracy to defraud him of the $30 million? Yes. And is she still a defendant in the underlying action? We obtained default judgments against her. So who's left? Who's still in the case in the district court? Gershell, Moritz, Univest, Boris Lopatin, Liu and her husband. But their default judgments against them. Or defaults. Yes. Okay. Thank you. May it please the Court, William Donovan on behalf of the appellees. Your Honor's addressed the key issues in our view on the appeal and your questions, so let me, if I can, start by addressing them. With respect to the privilege log, first and foremost, that argument was waived. There is absolutely no objection made to the ---- Well, but she said the counsel said that you attached it to your reply, so how could they argue about it? They could have tried to submit a surreply. There was oral argument in front of the judge. It's not waiver. You don't have to do that. That's not even permissible. Well, there was no attempt to ---- Well, I don't want to interrupt Judge Ward while she was talking, but I don't ---- Fair enough. Don't even suggest that they had an obligation to ask to file a surreply. Well, they did not object either in oral argument or by filing objections or with a surreply. Well, assuming that we don't buy that argument, what's your next argument? There are additional arguments, obviously. First of all, the case that they rely on heavily is Old Dominion. And in that case, they argue that somehow under the specific facts of that case, the privilege log was not considered by the trial court because there was an error in it. And the court instead said, look at the actual evidence. That evidence is what I want to see. That's provative as to the issue being addressed. But this privilege log is something that was prepared after the fact. I'm not sure in connection with which litigation, but not for this litigation. And it doesn't reflect that anything that's on the privilege log was something that Soe saw. Your Honor, the privilege log was, in fact, prepared in this litigation. And there are multiple references to documents and information that Mr. Soe saw, and I can give you examples. But how do you know that he saw them, that he read them or saw them? They were addressed to him. And in some instances, the only person they were addressed to was, in fact, Mr. Soe. But that doesn't tell us anything about what he garnered from them, you know, the effect on his knowledge or lack of knowledge regarding his cause of action. What does that tell us? Your Honor, it tells us one thing for sure, which is that Mr. Soe hired three law firms to defend him in the HSBC action in the fall of 2005. But it doesn't tell us to whom he attributed the fraud. It tells us nothing about that. We cited the Jolly case, the Norgaard case, the Fox case. Judge Pragerson relied upon those cases for the proposition that what we needed to show was that, number one, Mr. Soe knew that these defendants were out there, and he clearly did. Counsel did not dispute that fact. The only other probative issue is that he knew that these defendants were out here when Lucy Liu assured him that there was nothing wrong and he was relying on her. Your Honor, on pages 691 and 692 of the record on appeal, I asked Mr. Soe in deposition, clear as day, whether he was aware in the spring of 2005 that defendants on appeal were getting paid on these transactions. He said, yes, he knew. That doesn't mean that he was aware he was being defrauded. Just because they were being paid for investments doesn't give him knowledge that he's being defrauded. Your Honor, that information comes in the fall of 2005, where there were at least nine bits of information, we would argue, that put a reasonable person on inquiry notice. The disconnect that we believe Judge Pragerson found between our argument and our evidence and what they tried to do is the standard is a reasonable person standard and it's suspicion or inquiry notice. The test is not what they would like to have it, to ignore the reasonable person standard, to ignore suspicion, to ignore the duty to investigate, and instead look at the much later date at which Mr. Soe allegedly. Well, you know, what was at issue here was whether they raised a genuine, whether they produced sufficient evidence to raise a genuine issue of fact that warrants a trial on the issues that you just, the standard that you just articulated. Your Honor, I agree with you. But that's what, that's the only thing that was in play was did they present enough evidence to raise a genuine trial of issue of fact about his knowledge in the fall of 2005. Your Honor, I agree with you about the standard, but they didn't meet their burden. Under the Kennedy case, the publisher's killing justice. Well, I don't find, you can't put much stock in this privilege log. If I can, let me articulate for the panel what we believe are all of the information that was in front of Judge Pragerson and why he made the right decision. With all inferences drawn in favor of the nonmovement, right? Fair enough. Fair enough. Number one, his account was frozen in October 2005. 607 and 781 of the record. So was sent the injunction and trading order from his lawyers, page 133 of the record. I'm sorry. He was, so was what? So apparently was given a copy of the injunction and the tracing order. You said apparently. How do we know that? That's the privilege log aspect. The first. See, now you're, now you're taking, you're drawing certain inferences from the privilege log that he saw. Your Honor, I will completely ignore the privilege log. There are at least then four bits of evidence which confirm. Because that went from nine to four. Well, if you're not going to let me address the privilege log at all. Number one, the account was frozen. Number two, he is actually sued by HSBC. He is sued for a declaratory judgment that they are not responsible for his losses. But he had an assurance from them that, that his principle would be preserved. What does that do to the inference you would ask us to draw about the suit? Your Honor, I think the evidence is actually the opposite. What happened in the spring of 2005 was he sent a letter to HSBC trying to confirm that, in fact, his money would be safe and that it would not be depleted. HSBC didn't respond. Instead, what they did was they sent the letter to Mr. Brown, the fraudster, and Mr. Brown said he was furious with Mr. So for making the inquiry. He said that wasn't appropriate for Mr. So to contact the bank directly. Correct. And the U.K. court was very bothered by that testimony. On the other side, they have radically changed their story. Their story, not only at the trial court, but on appeal in the United Kingdom for years, was that Ms. Lew had invested money. Not that Ms. Lew was part of the problem. Not that Ms. Lew had defrauded him. Not that somehow it was Bayrou Wang's money. The argument was, instead, that it was Ms. Lew's money as well. And then when that argument didn't work, they turned on her and changed 180 degrees. But, Your Honor, if I could go back to that. You've listed two pieces of evidence. What's the third and fourth? The third is, and this is based upon the U.K. testimony, page 761 of the record, not the privilege log, that Mr. So hired lawyers and signed a retention agreement on October 21st, 2005, with the LaRue firm. The fourth bit of evidence is the one that Your Honor is referring to. So before you go on, didn't the London appellate court say that Mr. So wasn't on notice from all of those things you've listed? No. The London, not the trial court, but the court of appeals said that it was reasonable for Mr. Koh not to have a suspicion or an inkling that he had been defrauded at that point? Your Honor, I think the answer is clearly no. What did the London appellate court hold? As to that issue of knowledge, reasonable knowledge. The London court said that it was, both at the trial court and on appeals, said it would be unreasonable for Mr. So to rely on anyone in light of what he was aware of in the spring of 2005 with respect to Mr. Brown's conduct. But again, he is getting sued. So wait a minute. So the third piece was, was he retained counsel in London? Correct. The LaRue firm. I'm sorry.    The LaRue firm. The LaRue firm. To defend a case in which HSBC is saying we're not responsible for your losses. So and from that, you want us to infer that he knew that he had been defrauded by who is it? Brown? By the issue is whether he has reason to believe he has a loss, suspicion or reasonable inquiry. And then the analysis. Well, no. He has to know that he was defrauded, that somebody's defrauded. Not that he had a loss. Not just that he had a loss, but that somebody did something wrong to him. That is correct. And the account was frozen and he was sued because Mr. Brown had run off with the money. But that was between HSBC and Mr. So. Nothing to do with Mr. Brown. Right? Mr. Brown was not. Sorry. Was Mr. Brown a party? Yes, he was. To the London court? Yes, he was. And what was the ruling vis-à-vis Mr. Brown? He defaulted because he disappeared. But I want to get out the fourth piece of evidence, and Judge Wardlaw actually raised that in questions of counsel. The fourth piece of evidence is a conversation that Mr. So admittedly had November 17, 2005, not just with anybody at HSBC, but with someone in the security department telling him that the only way for him to get his money back was if he cooperated. So he sued. HSBC has frozen the account. I realize I asked that question of So's counsel, but isn't it equally reasonable to infer, based on that conversation and the fact that, in fact, his money, his account had been frozen, that it was just his money was just frozen while they investigated what was happening with Brown and that he would get it unfrozen as opposed to the money was lost and gone and he would get it back if he cooperated? Your Honor, I don't think that argument was made below. And I think the reasonable inference is actually on pages 14 and 15 of their opening brief, where they characterize the HSBC lawsuit in a way that actually we agree with. Isn't it an error not to construe these facts in the light most favorable to the nonmoving party? Your Honor, we don't think Judge Pragerson made any error at all. The only evidence that they put in front of him was a declaration from Mr. So, not addressing the facts that would put a reasonable person on notice, but in a sense it was two ships passing in the night. They were trying to argue that Mr. So did not know until the spring of 2006 that the money was gone. Subjective knowledge is not the test. The test is an objective standard. Right. And for Ms. Wang's declaration, it's even one step more removed because it's hearsay. She was trying to say not what a reasonable person would have known. She was trying to say what Mr. So knew. So it's hearsay and it's not addressing the right standard. Why didn't you have to? I don't know. What I don't understand here was once they, at least from my experience on the district court, whenever there was a privilege law that was filed like this and there was a fight over, you know, what document, what information was, might be contained in the document, there was always some effort to have the district court make a determination as to whether the privilege was properly asserted. Your Honor. That doesn't seem to have taken place here because a lot of this could have been resolved had you, you know, had you had the district court take a look at these documents and ask the district court to make a determination. Your Honor, I actually agree with you again, but here's what happened. They were ordered to produce the privilege log and they violated the court's order. So what they did was they did not produce the privilege log until we were well into the summary judgment briefing. And that's the predicament that all of us were in. Well, did you ask under Rule 56 for, did you, you know, when the reply came in, you say, you know, there's a procedure under Rule 56F, you know? Your Honor. We need to, even though it was your motion, I think you filed the motion for summary judgment. Our side did. That's correct. But there's a way to show the district court that something has occurred that requires some additional discovery. Your Honor, from our perspective, we had substantial evidence that was not rebutted that demonstrated why a reasonable person would have been on inquiry notice, suspected wrongdoing, in the fall of 2005. Counsel, going back to the London Appellate Court, I'm looking at page 614 of the record, paragraph 51, which is the London Appellate Court's ruling, disagreeing with the district, the trial court's ruling regarding the reasonableness of Mr. O's reliance on the letter of instruction. And it appears that the court says, even if it be correct that a reasonably prudent investor would have sought advice on how the arrangements in the LOI would work in practice, there was no reason for an investor to seek advice on the truthfulness and reliability of HSBC's own representation that it had accepted the LOI and intended to comply with its terms. That doesn't sound to me like the appellate court is saying that Mr. So should have been on notice of fraud at that point. Your Honor, I think the test is whether he should have been on notice that there had been wrongdoing, that he had a potential action. And, in fact, he had been sued for by HSBC by the fall of 2005, seeking a determination that they were not responsible for his losses. So while I don't disagree with the assertion that you've read from the court of appeals decision or your interpretation of the case. But, you know, it could be just that there was a bad investment. There was a bad investment from somebody who had fled and who has never been found. And he was actually sued. Think about it. If you've invested money, okay, and your account is frozen, I think it is reasonable for you to think that something bad has happened. When you add to that that you've actually been sued by your bank. Well, you know that somebody has done wrong to you. Somebody has. And just because he could have made a bad investment doesn't necessarily mean that he, that the person doing the investing engaged, you know, literally theft of his money. Your Honor, I like the way you phrased it the first time. But I agree with where I think you're going, which is this. This is not the ordinary case in which you invest. Potentially there's an issue with the quality of your investment. And the person who handled your investment has stayed in their office and they're in contact. And you have reason to believe that maybe it was either not a mistake or an honest mistake. Mr. Brown fled. The accounts were frozen. HSBC, the bank, has sued him. And, again, I would urge the Court to look at the carryover sentence. But they still had the letter of instruction which told Mr. So your money is safe with us, essentially. Your Honor, I think you were right for a different period of time. But by the fall of 2005 in October, they're not saying your money is safe with us. But how could they disavow the letter of instruction? How can a bank disavow a binding document or a document that it's been named to? How can that happen? Your Honor, I'm not HSBC's counsel. So I'm not going to disagree with you as to the point you're going to. But I think ultimately it proves our point. If Mr. So really had the letter of instruction and he believed it, and then instead of respecting it in October of 2005, they sue him. They sue him. And, again, look at their brief, the opening brief, bottom of 14, top of 15. They sue him for the losses because everybody knew the money was gone. And then what happens, again, on the letter of instruction point? Does he call HSBC and they say everything's fine? No. In addition to suing him, they say the only chance you have of getting your money back is if you cooperate with us. And so we think when you ---- But what does that say? Does that say that the money, that there's been fraud or a bad investment? That doesn't really put one on notice that there's been fraud at that point. Your Honor, when your bank is not honoring the letter of instruction, the person handling your money is vanished. Where you are told through this lawsuit that you're getting sued for money that is gone, I think you are put on notice. I think the standard is getting so high at this point that it's not what the rules intend. The issue is whether or not there's a question of fact in this point. I may or may not agree that he should, you know, maybe should have been on notice. But the issue is, is there enough to go to the jury for a jury to decide this? He's saying, I wasn't on notice. I had my letter of instruction from the bank. I thought they were still protecting my investment. You know, I was getting assurances from Ms. Lu that my money was, my principal was still intact. So you don't think that's enough to raise an issue of fact? No, Your Honor. And the letter of instruction, as we've been discussing, I think actually leads to the inference that we want, which is, you may be right that in the spring of 2005, Mr. So should have put his money in the bank because they gave him the letter of instruction. But the issue is, months later in the fall of 2005, whether there was any reason for him to believe anything other than essentially his money was gone. And that's why I think really just – Gone through fraud, though. Gone through someone who has disappeared and left the country. Absolutely. In the fall of 2005, is there documents in the record that show that So knew that Brown had absconded and was just no longer around? There is evidence in the record that he disappeared, that he was sued, that the account was – But did So know sometime in the fall of 2005 that Brown had fled? I believe the answer is yes. But, Your Honor, I would also submit to you that we're – So where can we find that in the record? I will try to get you a site. I think we put it in our brief. But here's the point I really want to make, Your Honor, which is I think you're being too tough on the standard with respect to what Judge Pragerson is supposed to do. The test is not whether Mr. So knew. The test is whether a reasonable person would have suspected and be put on inquiry notice. That's why I – That's the test. Nobody's going to quarrel you with the test. The question, as Judge Rawson just said, for purposes of summary judgment, did they present enough evidence to raise a genuine factual dispute about whether they were on notice consistent with that standard? And for the reasons we've been discussing, the answer, in our view, is no, particularly with the letter of instruction. I mean, there – you know, you start off by saying, well, there are nine pieces of evidence. I can give you – So we pull that down to four. Well, Your Honor – And I can get back up to the nine if you let me talk about the privilege log. Well, you can talk about the privilege log all you want. You know, I do think that the log – I mean, the document itself has some value, but what's important is you can't draw any particular inference from it because you don't know what these underlying documents say. That's right. What we do know from this log is that in the fall of 2005, there was some correspondence involving HSBC litigation, but we don't know what that was about. But, Your Honor – If you guys had gone through the process of having the district court make a determination as to whether or not those documents were truly privileged, you might be in a different position. But, Your Honor, I think there are at least two responses. Number one is they're the ones who violated Judge Pragerson's order and created that issue. Number two, if the documents – So we're supposed to hold that against them? Well, if the documents themselves are privileged, we never would have seen them anyway. I don't know. It just seems to me that if he did have those suspicions back in the fall of 2005 and thought he'd been defrauded, that any – a normal, ordinary person would have done something because – I mean, that's the inference I draw, because you wouldn't want to – I mean, a reasonable, ordinary person on suspicion that he's been defrauded of $30 million would act. That's a lot of money. Your Honor, I agree with you, but here's what he did. He hired three different law firms and he filed a counterclaim against HSBC. And the testimony that Mr. Soe offered in London over many days and in a written witness statement was not that our defendants did anything wrong, but in fact, he tried to blame everything on the deep pocket HSBC. And it didn't work. Well, and it seems to me there's a lot of people to blame in this. But, I mean, it's in the record that HSBC sued him. Why wouldn't he file a counterclaim against them? But he didn't file a counterclaim, you know, against other people. He tried to blame the case on HSBC. But he didn't know. I mean, the inference I draw from that is that he wasn't on notice of the other people who were involved. Well, he didn't sue us the first time around in the Central District, even though clearly he knew who we were. So I'm not sure which of the defendants, Your Honor, who I'm representing for purposes of the appeal. But, Judge Pius, to go back to your issue, I don't think that we had an obligation to scuttle the summary judgment process where we were bumping up against the trial date and potentially we could have gotten our own motion kicked by filing an additional challenge to the privilege log. I would agree with you that there is some value to the privilege log. It's the four other elements that I didn't get to that I can. And so that it's – in our view, it's icing on the cake. You cannot just submit the self-serving declaration, which they did, and say, you know what, I didn't do it. That's not all they did, counsel. And by the way, you're over your time. Okay. So does anybody have any other questions? Okay. Thank you. Thank you very much. You had a little bit of time left. Very briefly, I would point the Court to the record at 607. Our client was not sued, was not added as a defendant in the HSBC case until November 18, 2005. That's record at 607. Also, really important with respect to the Condis defendants to know that to this day, they maintain that the Michael Brown trading was legitimate, that our client made money, that they earned their commissions. They've taken that position in this lawsuit, the Meltzer deposition. That's the record at 416. Counsel, may I ask you if there is any evidence in the record regarding at what point, if any, Mr. So was aware that Brown had disappeared? There's nothing in the record that I'm aware of there. And in his declaration, he says, and also in his deposition testimony, he said he didn't even know that Lucy Liu had gone out and hired lawyers until she presents the bill in March or April of 2006. All right. Thank you, counsel. Okay. So versus Condis will be submitted. We'll take up Lee versus West Coast Life Insurance.
judges: Wardlaw, Paez, Rawlinson